UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TRACI CANNON-STOKES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. 03 C 1942 |
| ) | Judge Joan H. Lefkow |
| JOHN E. POTTER, Postmaster General, ) | |
| United States Postal Service, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Traci Cannon-Stokes ("Cannon-Stokes"), a postal worker, filed this action against

John E. Potter ("Potter"), the Postmaster General of the United States Postal Service ("Postal

Service"). Cannon-Stokes alleges that the Postal Service discriminated against her because of her

disability in violation of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. §§ 791 *et

seq.*, and retaliated against her for complaining of discrimination in violation of Title VII of the Civil

Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e-1 *et seq.* The court has jurisdiction over this

action pursuant to 28 U.S.C. §§ 1331 and 1343 and 29 U.S.C. § 791. Before the court is Potter's

motion for summary judgment. For the reasons stated below, the court grants the motion.

## I.    SUMMARY JUDGMENT STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any

material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

To determine whether any genuine fact exists, the court must pierce the pleadings and assess the

proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part

of the record. Fed R. Civ. P. 56(c) Advisory Committee's notes. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). In response, the nonmoving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the nonmoving party as well as view all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).

## II.    LOCAL RULE 56.1

Before reaching the merits of the motion for summary judgment and determining whether a genuine issue of material fact exists, the court must address the deficiencies in the parties' Local Rule 56.1 filings. Local Rule 56.1(a) provides that a motion for summary judgment must include, *inter alia,* a "statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law." This statement of material facts "shall consist of short numbered paragraphs, including within each paragraph specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph." Part (b) of Local Rule 56.1 requires a party opposing summary judgment to file, *inter alia,* a concise response to the movant's statement of material facts. For purposes relevant here, that statement is required to include a response to each numbered paragraph

2

in the moving party's statement, including in the case of any disagreement, "specific references to the affidavits, parts of the record, and other supporting materials relied upon." The rule is very clear that "all material facts set forth in the statement required of the moving party will be deemed admitted unless controverted by the statement of the opposing party." Local Rule 56.1(b)(3)(B).

In Plaintiff's Rule 56.1(b)(3) Response to Defendant's Statement of Facts and Statement of Additional Facts, Cannon-Stokes decided against filing any response to the material facts set forth in paragraphs 1-11, 19, 21, 22, 24, 27, 31, 32, 34-39, 41, 43, 45, 47, 49, 50, 53-56, 60, and 62 of Defendant's Local Rule 56.1 Statement of Uncontested Facts. Thus, these facts are deemed admitted.

Cannon-Stokes also admitted certain statements and/or denied certain statements but then improperly included additional facts in her response to paragraphs 12, 13, 15, 16, 18, 20, 23, 25, 26, 33, 40, 46, 51, 52, 57, 58, 59, 61, and 63 of Defendant's Local Rule 56.1 Statement of Uncontested Facts. As a result, the court will disregard the additional information in these paragraphs. *See Malec v. Sanford*, 191 F.R.D. 581 at 584 (N.D. Ill. 2000) ("Rule 56.1(b)(3)(B) 'provides the *only* acceptable means of . . . presenting additional facts.'"), quoting *Midwest Imports, Ltd.* v. *Coval*, 71 F.3d 1311, 1316 (7th Cir. 1995) (emphasis in original).

Potter also improperly included additional information in response to paragraphs 97, 112, 128, 137, 139, 140, 145, 156, 158, and 165 of Cannon-Stokes' Additional Statement of Uncontested Facts. Portions of Potter's responses to these paragraphs went beyond identifying improper characterizations of testimony or facts unsupported by the cited material and included new facts or additional information in an attempt to qualify the stated fact. Accordingly, the court will disregard the additional information contained in these paragraphs.

3

In response to Plaintiff's Additional Statement of Uncontested Facts, Potter also challenges the accuracy of Cannon-Stokes' portrayal of the cited evidence. *See* ¶¶ 66-69, 71, 74, 80, 82, 83, 88, 89, 92, 95, 97, 98, 99, 100, 103, 105, 106, 108, 109, 111, 116, 117, 119, 120, 123, 124, 125, 126, 127, 128, 130, 135, 139, 140, 141, 142, 143, 145, 146, 148, 149, 151, 152, 153, 154, 155, 156, 162, 164, 166, 167, 168, 170. To the extent that the court agrees or disagrees with Potter's challenges, or Cannon-Stokes' challenges to Potter's submissions, the court will note its findings in the context of the facts. The court will consider only those facts which are supported by the cited evidence. Likewise, the court will disregard documents submitted with a motion that are not referred to in the statement of facts or statement of additional facts, *e.g.,* Defendant's exhibits 8, 16, 17, 18. *See Malec*, 191 F.R.D. at 583 (noting that "[e]xperience has amply demonstrated the danger of making arguments a party has not advanced by relying on exhibits not explained by either side.").

## III.   FACTS[1]

### A.   Background

The Postal Service has employed Cannon-Stokes since 1989 and continues to do so today. Defendant's Local Rule 56.1 Statement of Uncontested Facts ("DSOF") ¶ 1. After working as a part-time employee, Cannon-Stokes became a career employee as a city letter carrier in December 1989. DSOF ¶ 2.

---

[1] The court has done its best to puzzle together the events and incidents giving rise to this lawsuit but notes, with not a little frustration, the parties' failure to provide substantive fact sections in their briefs and/or organize their Local Rule 56.1 statements chronologically. In his memorandum in support of his motion for summary judgment, Potter chose to present background information only. Cannon-Stokes ignored the obligation of submitting a fact section altogether. As Judge Castillo wisely counseled in *Malec v. Sanford*, "[t]he purpose of the fact section [in a memorandum in support of or opposition to summary judgment] is to provide the context of the case. As such, we strongly recommend organizing the facts chronologically. This section should inform the Court of the broad circumstances giving rise to the dispute but detail only those facts relevant to the motion." *Malec*, 191 F.R.D. at 585. By failing to provide such a context, the parties made the court's job of determining whether a genuine issue of material fact exists extremely difficult and time consuming.

In November of 1995, Cannon-Stokes was grabbed and sexually assaulted by a postal customer while delivering mail. Plaintiff's Additional Statement of Uncontested Facts ("PSOF") ¶ 65. As a result of the attack, Cannon-Stokes was diagnosed with Post Traumatic Stress Disorder ("PTSD"). PSOF at ¶ 67. She received medical treatment and, for medical purposes, was restricted from delivering mail on a residential delivery route. PSOF at ¶¶ 68, 69. She notified the Postal Service of her PTSD diagnosis and that her condition and medical restrictions were permanent. PSOF ¶ 68. In response to this diagnosis, the Postal Service placed Cannon-Stokes on limited duty, which meant that she did not have to deliver mail on a route with residential buildings. DSOF ¶ 46; PSOF ¶ 101.

## B.   Events Giving Rise to Cannon-Stokes' Claims in the Present Lawsuit

### 1.   The Austin Postal Station

On December 18, 1995, John Sims, the manager of the Austin postal station where Cannon-Stokes worked, sent a letter to the Postal Service's medical unit asking that Cannon-Stokes and all other limited duty employees submit to fitness for duty examinations. PSOF ¶ 95. The letter stated further that if these employees were unable to perform their duties, they should be discharged. *Id.*

Sims subsequently sent a letter to Joyce Alston of the Postal Service's Human Resources Department on December 29, 1995. PSOF ¶ 92; DSOF ¶ 24. Sims stated in this letter that there was nothing physically wrong with Cannon-Stokes but that she said that she had mental and emotional problems with returning to the street to deliver mail. PSOF ¶ 92. Sims indicated his belief that Cannon-Stokes wanted a transfer to the Loop Postal Station, that this was the only way she could get

a transfer, and that she did not want to work outside in the cold. PSOF ¶ 92.[2] The letter also advised that Cannon-Stokes had caused morale problems since going on limited duty. DSOF ¶ 24.

Sims also informed Yvonne Coleman of the Postal Service's Human Resources Department that Cannon-Stokes was causing morale problems and had done so since going on limited duty. PSOF ¶ 93, 157. Additionally, Sims notified Cannon-Stokes and the other limited duty employees at the Austin station that they could not speak to other co-workers and that they had to inform a supervisor any time they left the workroom floor, even if it was to go to the washroom. PSOF ¶ 94. Sims did not give this order to the employees who were not on limited duty. PSOF ¶ 94.

On another occasion, Sims orally informed Cannon-Stokes that her schedule was being changed to 4:00 a.m. PSOF ¶ 96. Cannon-Stokes had not received prior notice of the change, and Sims did not provide her with any documentation or forms for this change. *Id.* Cannon-Stokes filed a grievance, which the parties settled. *Id.* In settling the grievance, the Postal Service agreed that there was "no reason or justification" for changing Cannon-Stokes' schedule. *Id.* At some other point, Cannon-Stokes filed an Equal Employment Opportunity ("EEO") charge.[3]

[2]Potter disputes Cannon-Stokes' portrayal of the letter. In PSOF ¶ 92, Cannon-Stokes states that Sims wrote in his letter "that despite Plaintiff's mental and emotional problems, there was nothing wrong with her. Sims accused Plaintiff of seeking a transfer and trying to avoid working in the cold." The letter states, however, "There is nothing wrong with her physically, but she says she has mental and emotional problems with returning to the street delivering mail. . . . It is my belief that Ms. Cannon Stokes wants a transfer to Loop Station and maybe this is the only way she could get it. And that she does not want to work out side [*sic*] in the cold." Ex. F at USPS C-S 00707. While Cannon-Stokes' characterization of the letter slightly stretched its actual contents, neither party disputes the content of the letter or the fact that this letter was sent. *See, e.g.,* DSOF ¶ 24. Accordingly, the court will consider only the actual content of the letter rather than either party's characterization of its content.

[3]In paragraph 156 of Plaintiff's Statement of Additional Uncontested Facts, Cannon-Stokes states that she filed an EEO charge in late 1995 without providing any evidence supporting the date or existence of this charge. In fact, the existence of a 1995 EEO charge is refuted by her later statement regarding her other EEO charges. *See* Plaintiff's Rule 56.1(b)(3) Response to Defendant's Statement of Facts and Statement of Additional Uncontested Facts at ¶ 64 ("Plaintiff has filed five (5) EEO complaints. She has filed the following charges: 4-J-606-1208-96, 4-J-606-0013-00, 1999; 4-J-606-0252-00, 2000; 4-J-606-0173-01, 2001; and 4-J-606-0211-03, 2003."). Additionally, Cannon-Stokes references these other EEO charges but does not provide details of these charges, such as the basis of her complaints in these charges. *See* Plaintiff's Statement of Additional Uncontested Facts at ¶¶ 156, 158, 159.

2. Transfer to Graceland Annex Postal Station

A few months later, Cannon-Stokes' psychologist, Dr. Katherine Jeans, sent a letter to Postmaster Rufus Porter requesting that Cannon-Stokes be transferred to another postal station from the Austin station because of her PTSD. PSOF ¶ 97. Porter responded to Cannon-Stokes' psychologist by a letter dated March 8, 1996. *Id.* Porter informed Dr. Jeans that in order to process transfers, a legitimate vacancy must exist and that all stations were at their full complement at that time. As a result, he was unable to approve Cannon-Stokes' request for a transfer.[4]

Thereafter, Cannon-Stokes sent a letter to U.S. Senator Carol Moseley Braun on March 26, 1996. PSOF ¶ 98. In her letter, Cannon-Stokes apprised the senator of her sexual assault and the failure of the Postal Service to respond to her request for a transfer.[5] Cannon-Stokes also requested the senator's assistance in obtaining a desk job answering telephones. Shortly thereafter, Ms. Campbell, a supervisor at the Austin station, came to Cannon-Stokes' house and informed Cannon-Stokes that she was being transferred from that station to the Graceland Annex as the result of her request for a transfer in the letter to Senator Moseley Braun. Ms. Campbell also told Cannon-Stokes

---

[4]Again, Potter objects to Cannon-Stokes' characterization of the contents of a letter, which, in this instance, is the March 8, 1996 letter of Rufus Porter. *See* Defendant's Response to PSOF ¶ 97. Potter is correct in that Porter did not state that there were "no open positions anywhere else," as stated by Cannon-Stokes. *See* PSOF ¶ 97. At the same time, neither party disputes that the letter was sent by Porter or the contents of the letter. As a consequence, the court will consider the contents of the letter as written by Porter and not as characterized by either party.

[5]In PSOF ¶¶ 98 and 153 and repeatedly in her response memorandum, Cannon-Stokes asserts that she complained that she was being discriminated against by her managers in her letter to Senator Moseley Braun and that the Postal Service had refused to grant her requests for accommodations. While the letter states that the Postal Service had not shown her "any professionalism, support, and consideration since the incident occurred" and discusses incidents demonstrating how the management team was "not taking her job-related injury seriously," nowhere in the letter does Cannon-Stokes state that she was being discriminated against by her managers or mention a request for an "accommodation." In addition, the cited evidence does not support Cannon-Stokes' assertion that Campbell informed Cannon-Stokes that she was being transferred because of her letter to Senator Moseley Braun. PSOF ¶¶ 99, 154. The evidence, instead, shows that Campbell informed Cannon-Stokes that she was being transferred because she had requested a transfer in her letter to Senator Moseley Braun.

7

not to come back to the Austin station.

On April 20, 1996, Cannon-Stokes was transferred to the Graceland Annex. DSOF ¶ 48. That day, her new supervisor, Ms. Little, ordered Cannon-Stokes to sort and deliver a postal route. DSOF ¶ 49. Cannon-Stokes repeatedly asked Ms. Little whether the route was commercial or all residential, and Ms. Little informed her that it was mixed. DSOF ¶ 50. Cannon-Stokes then gave Ms. Little a copy of her limited-duty restrictions, which showed Cannon-Stokes was unable to deliver mail on a route that had residential buildings. PSOF ¶ 101. Ms. Little refused to look at the document and directed Cannon-Stokes to deliver the mail. *Id.* Ms. Little told Cannon-Stokes that she believed that Cannon-Stokes' transfer to the Graceland Annex was at Cannon-Stokes' request and that Cannon-Stokes was a full-duty carrier. DSOF ¶ 51. Cannon-Stokes tried to make a delivery but returned to the postal station without completing her route because she was "terrified." DSOF ¶ 52; PSOF ¶ 102.

On the following Monday, Cannon-Stokes spoke with Barbara Holman, the manager of the Graceland Annex, who informed Cannon-Stokes that her transfer to the Graceland Annex was rescinded and that she should return to the Austin station. PSOF ¶ 103. Holman told Cannon-Stokes that she had not asked for a limited-duty carrier and that Cannon-Stokes was such a carrier. [6] *Id.* Holman had received no prior notice that Cannon-Stokes was assigned to the Graceland Annex until Cannon-Stokes arrived for work on April 20, 1996. PSOF ¶ 104. Holman had contacted Sims but

---

[6]Potter raises a hearsay objection to Cannon-Stokes' characterization of what Holman told her. *See* Defendant's Response to PSOF ¶ 103. In PSOF ¶ 103, Cannon-Stokes claims that Holman told her that she, Holman, had asked for a "full-body carrier" and that she did not want Cannon-Stokes because she was on limited duty. The cited evidence fails to support Cannon-Stokes' use of the "full-body carrier" language. Thus, the court will consider only Cannon-Stokes' version of the conversation to the extent that it is supported by her testimony. Such testimony is not hearsay because it is not being offered for the truth of the matter asserted, *e.g.* that Holman had not asked for a limited-duty carrier, but to show Holman's motive for rescinding Cannon-Stokes' assignment to the Graceland Annex.

8

did not attempt to speak with anyone else regarding why or how Cannon-Stokes came to be assigned to the Graceland Annex. *Id.* Holman also had asked Sims if Cannon-Stokes was on limited duty. PSOF ¶ 109. According to Holman, Sims had claimed that Cannon-Stokes was not on limited duty. *Id.*

After informing Cannon-Stokes that her offer was rescinded and that she should return to the Austin station, Holman telephoned Sims, notifying him that she was sending Cannon-Stokes back to the Austin station. PSOF ¶ 107. Sims replied, "Okay." *Id.* Cannon-Stokes also contacted Sims but received a different reaction. *Id.* Sims informed Cannon-Stokes that she did not belong at the Austin station and told her to "get out."[7] *Id.* Because Holman and Sims refused to allow Cannon-Stokes to remain at or return to their respective postal stations, Cannon-Stokes was not allowed to work for approximately seven to eight weeks and, as a result, lost annual and sick leave and a step increase in pay. PSOF ¶ 110.

### 3. Another Transfer Request

In May of 1996, Dr. Jeans sent a letter to Wanda Prater, the acting supervisor of customer support for the Postal Service, requesting a reassignment for Cannon-Stokes to a strictly commercial district or a change in craft. PSOF ¶ 76.[8] Prater responded to this request by a letter dated June 13, 1996. PSOF ¶¶ 76, 111. Prater denied Cannon-Stokes' request to deliver mail on a strictly

---

[7] According to Sims, he does not recall speaking with Cannon-Stokes when she returned to Austin. *See* Postal Service's Response to Plaintiff's Additional Statement of Uncontested Facts at ¶ 107. Cannon-Stokes' cited materials reveal that she contacted Sims both by telephone and in person, but her statement of uncontested facts does not differentiate between the two events. Sims only references her return to the Austin Postal Station, not the telephone conversation. Taking the facts in the light most favorable to Cannon-Stokes, Cannon-Stokes spoke with Sims and he informed her that she did not belong at the Austin station and he told her to "get out."

[8] The court notes that Cannon-Stokes referred to the May 1996 letter from Dr. Jeans to Wanda Prater and Prater's response in PSOF ¶¶ 76 and 111. In both instances, Cannon-Stokes suggested that Dr. Jeans' letter included a request for an accommodation. Potter did not contest ¶ 76 but contested ¶ 111 because Cannon-Stokes used the term "accommodation" but neither Dr. Jeans' letter nor Prater's letter referred to an "accommodation."

commercial route. PSOF ¶ 76, 111. Prater instead recommended that Cannon-Stokes request a change in craft to an available position and that Cannon-Stokes direct her request to Postmaster Rufus Porter. *Id.*

Cannon-Stokes sent a letter to Porter requesting a change in craft into a field that may be available and/or of interest to her. DSOF ¶ 62. Cannon-Stokes specified that she preferred a position in motor vehicles or as a phone center representative. *Id.* Porter responded by a letter dated July 18, 1996 in which he informed Cannon-Stokes that there were no available positions in the crafts mentioned in her letter and that it was not possible to anticipate when a vacancy would occur. DSOF ¶¶ 59, 63. As a result, the Postal Service was unable to grant her request for a change in craft. PSOF ¶ 112.

4.    Clearing Postal Station

Cannon-Stokes was reassigned to the Clearing postal station in August or September of 1996 and worked at that station until February of 1997. PSOF ¶ 114. Although the job offer at this postal station set Cannon-Stokes' starting time at 6:00 a.m, Cannon-Stokes' managers frequently changed her starting time to anywhere from 3:00 a.m. to 5:00 a.m. PSOF ¶ 115. These changes occurred despite the fact that the Postal Service's policies dictated that a manager must inform and obtain the approval of the Injury Compensation unit if he or she wants to change the starting time of a limited-duty employee. *Id.*

Like her position at the Austin station, Cannon-Stokes also sorted mail at the Clearing station. *Id.*; PSOF ¶ 116. Cannon-Stokes, however, found her assignment at the Clearing station less desirable than her previous placements because of the earlier starting time and because she worked longer hours without a lunch break. DSOF ¶ 25. She did not know what her assignment

would be day to day and, instead, had to ask her supervisor what she was supposed to do next after finishing a task. DSOF ¶ 29. Her assignment at the Clearing station also differed from her previous position in that she unloaded trucks of mail at the Clearing station. DSOF ¶ 30.

On one occasion, Ms. Curtis, Cannon-Stokes' supervisor at the Clearing station, demanded that Cannon-Stokes give her Cannon-Stokes' doctor's telephone number in front of the other mail carriers. DSOF ¶ 28; PSOF ¶ 119. Ms. Curtis then telephoned Cannon-Stokes' doctor to push back the time of Cannon-Stokes' appointment.[9] *Id.*

### 5. Search for a New Position

After the Office of Workers' Compensation Programs determined that Cannon-Stokes' restrictions were permanent, John Richardson, the Postal Service's Human Resources manager, sent a request to the area managers and officials of other postal stations on November 13, 1996, asking that they provide a position that met Cannon-Stokes' job restrictions. PSOF ¶ 120. This request was sent out again on December 17, 1996. *Id.* After receiving negative responses, Richardson directed the managers to look harder for an available position for Cannon-Stokes. PSOF ¶ 121.

On February 12, 1997, Richardson sent Cannon-Stokes a job description for a modified carrier position with the Grand Crossing station. DSOF ¶ 53; PSOF ¶ 122. The Postal Service had modified Cannon-Stokes' job responsibilities to comply with her medical limitations. DSOF ¶ 54. Cannon-Stokes accepted the job offer on February 20, 1997. DSOF ¶¶ 32, 47, 55.

---

[9]Cannon-Stokes also asserts that Ms. Curtis told Cannon-Stokes' co-workers that nothing had happened to Cannon-Stokes while she worked at the Austin station and that Cannon-Stokes had invented the incident. PSOF ¶ 118. Such testimony is inadmissible hearsay, however, because Cannon-Stokes testified that she did not hear Ms. Curtis make these statements; instead, she is attempting to offer what her co-workers told her for the truth of the matter asserted: that Ms. Curtis made such statements about Cannon-Stokes.

6.    Grand Crossing Postal Station

Although Cannon-Stokes had received a formal job assignment for the Grand Crossing station, she was forced to explain her assignment and provide evidence of her limited-duty or modified assignment each time a new manager was assigned to the Grand Crossing station. PSOF ¶ 125. Additionally, Cannon-Stokes was injured when attempting to comply with a request that she case mail for seven-and-a-half consecutive hours even though a carrier is entitled to two breaks and a lunch during a shift.[10] PSOF ¶ 126. Cannon-Stokes' duties at the Grand Crossing station also included interacting with customers who came to the postal station to pick up their mail. DSOF ¶ 23. Cannon-Stokes never objected to this responsibility. *Id.*

In 1999, Cannon-Stokes filed an EEO charge in which she complained that a supervisor at the Grand Crossing station, Mr. Hibbler, was sexually harassing her. DSOF ¶ 42; PSOF ¶ 158. As a result of the charge, the Postal Service attempted to transfer Cannon-Stokes from the Grand Crossing station to the Hegewisch station, but Cannon-Stokes said that she did not want to be transferred. *Id.*; PSOF ¶ 158.

Each of the three years that Cannon-Stokes worked at the Grand Crossing station, she was passed over in choosing vacation dates despite the fact that vacation is assigned according to seniority. PSOF ¶ 162. Cannon-Stokes would bring this oversight to management's attention and would bump someone from their allotted vacation time.

In August of 2000, Ms. Prater, a manager at the Grand Crossing station, informed Cannon-

---

[10]At some point, Cannon-Stokes was transferred from the Grand Crossing station to the Jackson Park station because the Grand Crossing station had a rodent problem. DSOF ¶ 33. After working for two days at the Jackson Park station, Cannon-Stokes was transferred to the South Chicago station, where she worked for several months. PSOF ¶ 136. Cannon-Stokes was then transferred back to the Grand Crossing station, where she stayed until 2000. *Id.*; DSOF ¶ 36. Despite the transfers, her job responsibilities remained similar from station to station. DSOF ¶¶ 34, 35, 37.

Stokes that she was no longer needed at that station and directed her to return to the Postal Service's Injury Compensation Unit. PSOF ¶ 137. Ms. Prater then began to yell at Cannon-Stokes in front of other employees about Cannon-Stokes' PTSD. *Id.* Cannon-Stokes remained at the Grand Crossing station until she was transferred at her request to the Garfield Park station. DSOF ¶ 38.

7.    Garfield Park Station

When Cannon-Stokes transferred to Garfield Park, the manager of Garfield Park, Ms. Montgomery, gave Cannon-Stokes her personnel file and told her to return downtown. PSOF ¶ 138. Cannon-Stokes then contacted the area manager, Ms. Jalla, who told Cannon-Stokes to return to the Garfield Park station. *Id.* At some point, Cannon-Stokes was directed to deliver two parcels and express mail on a residential route in violation of her medical restrictions. PSOF ¶ 139. Cannon-Stokes responded by informing the individuals to read her restrictions, and they had other employees deliver the mail. Cannon-Stokes also was directed to shovel snow, sweep the floor, and empty the garbage even though her modified carrier position restricted her to inside duties only.[11] PSOF ¶ 140.

8.    Austin Station

Cannon-Stokes worked at the Garfield Park station for three years until she was transferred to the Austin station, where she remains. DSOF ¶ 39. Her job responsibilities at the Austin station have included marking mail to return it to the sender, loading mail on and off trucks, and casing mail. DSOF ¶ 40.

---

[11]Cannon-Stokes asserts that these duties were outside her medical restrictions. *See* PSOF ¶ 140. The only medical restriction that Cannon-Stokes has identified, however, is delivering mail in residential areas.

### C.   Cannon-Stokes' Limitations

Cannon-Stokes' PTSD has rendered her unable to deliver mail on a residential delivery route. DSOF ¶ 9. Cannon-Stokes is unable to enter small residential apartment buildings or private residences if there is a possibility that she might have to interact with an individual by herself, and she cannot deal with customers on a "one on one" basis unless other familiar people are nearby and there is a barrier in between herself and the customer. PSOF ¶ 72. She eats most of her meals at home; she does not go to movies; she does not go to the grocery store; she has not taken any vacations or gone away for a weekend; she does not walk her children to school; and she never rides the "L" or subway. PSOF ¶ 71. She is no longer married and does not have a normal family life. PSOF ¶ 72.

Despite these limitations, Cannon-Stokes is able to deliver mail on a commercial route, regardless of whether it is inside or outside. DSOF ¶¶ 6, 10. She also is able to perform clerical work and to case mail inside any postal facility. DSOF ¶¶ 7, 11. She would be able to deliver mail inside an office building or a high-rise apartment building with a mail room. DSOF ¶ 8. Cannon-Stokes is able to drive, go to the park, ride the bus, and eat in restaurants. DSOF ¶¶ 12, 13, 14, 15. She has driven to her attorney's office and to work. DSOF ¶¶ 16, 19. She walked from her attorney's office to the federal building for her deposition. DSOF ¶ 18. She admits that she has no trouble walking, seeing, hearing, speaking, breathing, grooming herself, getting ready for work in the morning, taking care of her son, or performing manual tasks like cooking and writing. DSOF ¶ 20.

## III.     DISCUSSION

### A.     Disability under the Rehabilitation Act

Cannon-Stokes claims that Potter violated the Rehabilitation Act by discriminating against her because of her disability and by failing to accommodate her disability. The Rehabilitation Act protects a "qualified individual with a disability" from discrimination solely because of her disability in any program receiving federal financial assistance. *Branham* v. *Snow*, 392 F.3d 896 at 902 (7th Cir. 2004), citing 29 U.S.C. § 794(a). To establish a *prima facie* case of discrimination under the Rehabilitation Act, Cannon-Stokes must show that (1) she is disabled within the meaning of the statute, (2) she is otherwise qualified to perform her job, (3) she was involved in programs receiving federal financial assistance, and (4) she was excluded from participation, denied benefits, or otherwise discriminated against solely because of her disability. *Id.*, citing *Silk* v. *City of Chicago*, 194 F.3d 788, 798 n.6 (7th Cir. 1999).

Under the Rehabilitation Act,[12] a person is disabled if she has (a) a physical or mental impairment that substantially limits one or more of the major life activities of an individual; (b) a record of such impairment; or (c) being regarded as having such an impairment. *Id.*, citing 29 U.S.C. § 705(20)(B). The parties confine their analysis to the first method of establishing disability, having a physical or mental impairment, and the court will do likewise.

In this case, Cannon-Stokes has not met her burden of establishing that she is disabled within the meaning of the Rehabilitation Act because she has failed to show that she is substantially limited

---

[12]The Rehabilitation Act provides that the standards of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, are to be used in determining whether a violation of the Rehabilitation Act has occurred within the context of employment. *Id.*, citing 29 U.S.C. § 794(d); *Peters* v. *City of Mauston*, 311 F.3d 835, 842 (7th Cir. 2002); *Silk*, 194 F.3d at 798 n.7. Accordingly, the court will refer to the ADA's provisions and standards in determining whether a violation of the Rehabilitation Act occurred.

in one or more of her major life activities. A major life activity is an activity of central importance to daily life. *Toyota Motor Mfg., Kentucky, Inc.,* v. *Williams*, 534 U.S. 184, 151 L. Ed. 2d 615, 197 122 S. Ct. 681 (2002). ADA regulations provide the following representative list of major life activities: caring for oneself, performing manual tasks, walking, seeing, hearing, breathing, learning and working. 29 C.F.R. § 1630.2(i). Cannon-Stokes admits that she has no trouble walking, seeing, hearing, speaking, breathing, grooming herself, getting ready for work in the morning, casing mail, taking care of her son, or performing manual tasks like cooking and working. She asserts, however, that she is significantly limited in her ability to be outside in a residential area, to enjoy life, and to interact or communicate with people while alone.

The ability to enjoy life is not a major life activity within the meaning of the Rehabilitation Act, and, as Potter points out, is instead a state of being or existence. To the extent that Cannon-Stokes is unable to be outside in a residential area or engage in leisure activities, such as going to the movies, taking vacations, or going away for a weekend, these activities generally do not have the same significance as major life activities, including breathing, hearing and learning. *See Sinkler* v. *Midwest Prop. Mgmt. Ltd. Pshp.*, 209 F.3d 678 at 684 (7th Cir. 2000) ("consider unlisted activities in contrast to listed activities to determine whether the unlisted activity has equal 'significance.'").

Although the Seventh Circuit has not addressed whether interacting with others constitutes a major life activity for ADA or Rehabilitation Act purposes, courts within this district have recognized that interacting with others is a major life activity. *See McKay* v. *Town & Country Cadillac, Inc.*, No. 97 C 2102, 2002 U.S. Dist. LEXIS 10257 (N.D. Ill. June 7, 2002) (relying on previous memorandum opinion and order, court determined that family and social relations constitute a major life activity); *Fitch* v. *Cont'l Cas. Co.*, No. 01 C 1149, 2002 U.S. Dist. LEXIS

16

24269 (N.D. Ill. Dec. 16, 2002) ("Interacting with co-workers or peaceful interaction with others in any context is an activity that is central to most people's daily lives and therefore constitutes a major life activity.") (internal quotations and citations omitted); *Wagner* v. *Ill. Dep't of Pub. Aid*, No. 98 C 7268, 2004 U.S. Dist. LEXIS 22562 at *15 (N.D. Ill. Nov. 5, 2004) (holding that, as a matter of law, plaintiff was not substantially limited in the major life activity of interacting with others); *Perkins* v. *Ameritech Corp.*, No. 00 C 5655, 2004 U.S. Dist. LEXIS 17232 (N.D. Ill. Aug. 27, 2004) (plaintiff had presented some evidence that she was limited in her ability to interact with others). Cannon-Stokes has qualified this activity further by asserting that she is substantially limited in her ability to interact with others while alone. The court is not convinced that "the ability to interact with others while alone" is a separate and distinct major life activity from the more general "ability to interact with others," and Cannon-Stokes has offered no argument as to why the court should consider it as such.

Assuming, however, that the ability to interact with others while alone is a major life activity, Cannon-Stokes has not offered sufficient evidence to establish that she is substantially limited in this major life activity *because of* her PTSD. Cannon-Stokes has averred that she does not go to the grocery store or walk her children to school or ride the subway. She also has stated that she does not have a normal family life and is no longer married. Absent from these facts is evidence, such as the testimony or affidavit of her psychiatrist or other treating physician, that Cannon-Stokes is unable to go to the grocery store or walk her children to school or use public transportation because of her PTSD. She instead relies on her conclusional testimony and affidavit as evidence that she has

17

difficulty engaging in these activities because of her PTSD.[13] *Cf. McAlindin* v. *County of San Diego*, 192 F.3d 1226, 1235 (9th Cir. 1999), *amended on other grounds*, 201 F.3d 1211 (9th Cir.2000), *cert. denied*, 530 U.S. 1243 (2000) (plaintiff offered medical evaluations documenting his difficulty interacting with others in support of his claim that he was substantially limited in the major life activity of interacting with others). Under Seventh Circuit precedent, "these conclusory allegations, unsupported by the record, are insufficient to avoid summary judgment." *Albiero* v. *City of Kankakee*, 246 F.3d 927 at 933 (7th Cir. 2001), citing *Slowiak* v. *Land O'Lakes, Inc.*, 987 F.2d 1293, 1295 (7th Cir. 1993); *Drake* v. *Minn. Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998).

Likewise, Cannon-Stokes' inability to enter a small apartment building or residence where she may meet with a postal patron or deal with customers on a "one on one" basis unless other employees or people with whom she is familiar are near her and there is a barrier, *see* Plaintiff's Statement of Additional Uncontested Facts at ¶¶ 71-72, is not sufficient to demonstrate that she is substantially limited in her ability to interact with others while alone. This is but a mere scintilla of evidence and insufficient to withstand summary judgment.

Because Cannon-Stokes has failed to offer sufficient evidence from which a reasonable jury could conclude that she has a disability, an element essential to her claims under the Rehabilitation

---

[13]During her deposition, Cannon-Stokes testified that she does not go grocery shopping because "[i]t's uncomfortable" because she feels "disorganized." *See* Exhibit 3 at 7-8. When asked to describe her feelings about grocery shopping, Cannon-Stokes said that "it's about being out in public." Exhibit 3 at 8. She also testified that she has no leisure activities; she goes to the park once or twice a week; and she drives her mother's car once or twice a week. Exhibit 3 at 8-9. Cannon-Stokes responded in the negative when asked whether she ever goes to the beach or goes swimming; whether she had been on vacation or taken a weekend trip in the past several years; and whether she exercises. *See* Exhibit 3 at 10-11. Notably, Cannon-Stokes did not testify that she does not and has not engaged in these activities because of her emotional condition. She also did not testify that she does not go to the movies, walk her children to school, or ride the "L" or subway because of her emotional condition. In her affidavit, however, Cannon-Stokes testified that she is not emotionally able to walk her children to school or take care of all of their needs and that she does not ordinarily walk outside in a residential area with them unless she is with a friend. *See* Exhibit A at ¶ 9.

Act, Potter is entitled to summary judgment on Cannon-Stokes claims of disability discrimination and failure to accommodate.

## B.    Retaliation

As with other employment-related claims, a plaintiff may proceed with a claim of retaliation pursuant to either the direct or indirect method. *Luckie v. Ameritech* Corp., 389 F.3d 708, 714 (7th Cir. 2004). Cannon-Stokes has presented no direct evidence that Potter retaliated against her for filing an EEO charge. Thus, she must proceed under the indirect burden-shifting method of proof established by *McDonnell-Douglas Corp.* v. *Green*, 411 U.S. 792, 804, 36 L. Ed. 2d, 93 S. Ct. 1817 (1973). *See DeLuca* v. *Winer Indus.*, 53 F.3d 793, 797 (7th Cir.1995) (applying the *McDonnell-Douglas* method to ADA cases).

Under the indirect method, a plaintiff must first establish a *prima facie* case of retaliation by showing that (1) after lodging a complaint about discrimination,[14] (2) only she, and not any otherwise similarly situated employee who did not complain, was (3) subjected to an adverse employment action even though (4) she was performing her job in a satisfactory manner. *Johnson* v. *Cambridge Indus.*, 325 F.3d 892, 897 (7th Cir. 2003), quoting *Stone* v. *City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 642 (7th Cir. 2002). When utilizing the indirect-method, the plaintiff does not need to show "even an attenuated causal link." *Haywood* v. *Lucent Techs.*, 323 F.3d 524, 531 (7th Cir.

[14] It is undisputed that Cannon-Stokes filed an EEO charge against the Postal Service. In fact, she has filed five EEO complaints against the Postal Service: (1) 4-J-606-1208-96; (2) 4-J-606-0013-00; (3) 4-J-606-0252-00; (4) 4-J-606-0173-01; and (5) 4-J-606-0211-03. Unfortunately, neither party chose to explain the circumstances of or direct the court's attention to any evidence of the June 21, 1996 EEO charge, which is the basis of this matter, *see Cannon-Stokes* v. *Potter*, No. 03 C 1942, 2004 U.S. Dist. LEXIS 3272, at *3 (N.D. Ill. Mar. 5, 2004), or Cannon-Stokes' subsequent EEO charges. This gap in the evidentiary record makes it impossible for the court to determine what allegations were included in the original charge, what incidents of retaliation may have resulted from the charge, and whether the subsequent EEO charges related to or arose from the original EEO charge. *See Ezell* v. *Potter*, 400 F.3d 1041 (7th Cir. 2005) (in determining whether the plaintiff's current allegations fall within the scope of the earlier charges, the court "looks to whether the allegations are like or reasonably related to those contained in the EEOC complaint.").

2003). If the plaintiff establishes a *prima facie* case, "the burden shifts to the defendant to come forward with a legitimate, non-invidious reason for the adverse employment action." *Id.* "Once the defendant presents a legitimate, non-invidious reason for the adverse employment action, the burden shifts back to the plaintiff to show that the defendant's reason is pretextual." *Id.* At all times, the burden of persuasion rests with the plaintiff. *Id.*

In her response to Potter's motion for summary judgment, Cannon-Stokes fails to address the elements necessary to establish a *prima facie* claim of retaliation, cite to pertinent authority, or argue as to how any of the alleged acts satisfy the elements. As a result, Cannon-Stokes has waived her claim of retaliation. *See 330 West Hubbard Restaurant Corp.* v. *United States*, 203 F.3d 990, 997 (7th Cir. 2000) ("A party's failure to address or develop a claim in its opening brief constitutes a waiver of that claim. . . . In order to develop a legal argument effectively, the facts at issue must be bolstered by relevant legal authority; a perfunctory and undeveloped assertion is inadequate to raise a separate basis for appeal.") (internal citations and quotations omitted).

Even if the court were to consider the evidence offered by Cannon-Stokes in support of her claim of retaliation, this claim fails because many of the purported incidents of retaliation do not constitute adverse employment actions and because she has not identified any similarly situated employees who were treated more favorably. The Seventh Circuit has defined adverse employment actions "quite broadly," *Smart* v. *Ball State Univ.*,89 F.3d 437, 441 (7th Cir. 1996), yet an adverse employment action must be more than a "mere inconvenience or an alteration of job responsibilities" to be actionable. *Crady* v. *Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993). A "materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits,

20

significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Smart*, 89 F.3d at 441 (citation omitted).

Cannon-Stokes offers the following incidents as evidence of retaliation: (1) after writing the letter to Senator Moseley Braun, Cannon-Stokes' supervisor came to her house and told her that she was being transferred because of the letter; (2) being warned by the same supervisor not to come back to the Austin station; (3) being told by Holman to return to the Austin station and then being told by Sims to "get out;" (4) Sims statement to the EEO investigator that Cannon-Stokes was causing morale problems; (5) being told by that she was being transferred to Hedgewich station because of her EEO charge at the Grand Crossing station; (6) Cannon-Stokes was denied overtime even though other employees, some of whom were on light or limited duty, were allowed to work overtime; (7) being passed over on vacation requests each year even though such requests should have been made by seniority; (8) other carriers received transfers to clerk positions while Cannon-Stokes was denied such an opportunity.[15]

As discussed by Potter, three of Cannon-Stokes' examples of retaliation are based on distortions of the factual record. First, Cannon-Stokes was advised by her supervisor that she was being transferred because she had requested a transfer in her letter to Senator Moseley Braun and not, as Cannon-Stokes asserts, because she sent the letter to the senator. Second, Cannon-Stokes testified with regard to being passed over on vacation requests that when it became apparent that she had been skipped inadvertently, she was able to bump people who had selected their vacations before her.

---

[15]Cannon-Stokes also asserts generally that the actions discussed in section II of her brief were based on retaliation, *see* Plaintiff's Response to Defendant's Motion for Summary Judgment at 16, but she does not specify which of these actions constituted retaliation or provide any legal analysis of these actions.

Third, when Cannon-Stokes was informed that she would be transferred to the Hedgewich station because of her unrelated EEO charge of harassment at the Grand Crossing station, she objected to the transfer. Because of her objection, Cannon-Stokes remained at the Grand Crossing station until she was transferred to the Garfield station at her request.

With regard to Cannon-Stokes' transfers and the Postal Service's attempt to transfer Cannon-Stokes following her EEO charge of sexual harassment at the Grand Crossing station, Cannon-Stokes has not shown how such transfers or the attempt to transfer her significantly altered the terms and conditions of her employment. As recognized by the Seventh Circuit, "[b]y definition, any lateral job transfer will result in changes to an employee's job responsibilities and work conditions. To sustain a federal employment discrimination suit, a plaintiff must show something more than the ordinary difficulties associated with a job transfer." *O'Neal* v. *City of Chicago*, 392 F.3d 909 at 913 (7th Cir. 2004), citing *Conley* v. *Vill. of Bedford Park*, 215 F.3d 703, 712 (7th Cir. 2000) ("A materially adverse change in employment conditions must be more disruptive than mere inconvenience or alteration of job responsibilities."). Cannon-Stokes has conceded that her job responsibilities remained essentially the same despite the transfers, and "being shifted to an essentially equivalent job that [an employee does] not happen to like as much does not a Title VII claim create." *Id.*, quoting *Place* v. *Abbot Labs.*, 215 F.3d 803, 810 (7th Cir. 2000). Likewise, having to ask her supervisor each day for her assigned tasks, unloading mail trucks, different starting times, and working longer before taking a lunch break are more properly classified as "mere inconveniences" than as adverse employment actions. *See, e.g., Grube* v. *Lau Indus.*, 257 F.3d 732, 728 (7th Cir. 2001) (change in working hours did not rise to the level of adverse employment action where unaccompanied by any change in pay, title, or significantly diminished job responsibilities).

22

Additionally, being accused of causing morale problems and told not to return to a postal station after being transferred, while certainly not complimentary, do not constitute an adverse employment action in the absence of a tangible job consequence.

To the extent that the Postal Service refused to allow Cannon-Stokes to change her craft from a letter carrier to a clerk position, such an action may constitute adverse employment action under Title VII.[16] Unfortunately, there is no evidence that Cannon-Stokes ever requested a change in craft to a clerk position and, as a result, was never denied the opportunity to change her craft to a clerk position. She instead requested a change of craft "into a field that may be available and/or of interest to me. If I were given a preference it would be to motor vehicles or even the phone center representative position." *See* Defendant's Local Rule 56.1 Statement of Uncontested Facts at ¶ 62.

Cannon-Stokes also asserts in a conclusional fashion that "[o]ther employees, some of whom were on light or limited duty, were allowed to work overtime while Plaintiff was wrongly denied overtime." Plaintiff's Response to Defendant's Motion for Summary Judgment at 16. Being denied an overtime assignment overtime also may constitute an adverse employment action "because the denial of overtime would affect the overall pay, even if it would not affect [her] salary."[17] *Market v. Ill. Bell Tel. Co.*, No. 01 C 3841, 2003 U.S. Dist. LEXIS 20397, 2003 WL 22697284 at *8 (N.D. Ill. Nov. 13, 2003); *but see Cisneros* v. *City of Chicago*, No. 00 C 8059, 2002 U.S. Dist. LEXIS

---

[16]Cannon-Stokes offers no argument or authority for the proposition that the denial of a transfer to another position constitutes an adverse employment action. Nor does Cannon-Stokes assert that the transfer to a clerk position would constitute a promotion.

[17]Again, Cannon-Stokes cites to no authority for the proposition that the denial of an assignment of overtime constitutes an adverse employment action. In addition, there is no evidence as to the nature of overtime assignments, *e.g.*, whether such assignments are discretionary. Such information is vital to determining whether an adverse employment action occurred because an adverse employment action does not include an employer's refusal to grant an employee a discretionary benefit, such as a bonus, to which she is not automatically entitled. *See Rabinovitz* v. *Pena*, 89 F.3d 482, 488-89 (7th Cir. 1996).

19886, 2002 WL 31356404, *6 (N.D. Ill. Oct. 17, 2002) (finding that the denial of overtime was not an adverse employment action because the plaintiff received a substantial amount of overtime, and she was not entitled to work overtime each time she requested it). Cannon-Stokes' claim fails, however, because Cannon-Stokes has not established that she was denied overtime. *See* PSOF at ¶ 160. In support of this claim, she cites to her deposition testimony, which discusses other employees who received overtime, but does not include any facts or information regarding the denial of overtime as it relates to herself. *See id.*

Additionally, while other employees may have received overtime assignments, these employees are only relevant to Cannon-Stokes' claim of retaliation if they are comparable or similarly situated to her. In order to establish that a similarly situated employee was treated more favorably, an employee must offer evidence about someone who is "similarly situated with respect to performance, qualifications, and conduct." *Peters* v. *Renaissance Hotel Operating Co.*, 307 F.3d 535, 546 (7th Cir. 2002), quoting *Radue* v. *Kimberly-Clark*, 219 F.3d 612, 618 (7th Cir. 2000). This comparison is normally established by showing that the "two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating of mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.*, quoting *Radue*, 219 F.3d at 618. Cannon-Stokes' references four employees who were allowed to work overtime hours and mentions whether these employees were on light duty or limited duty and their place of employment. *See* PSOF ¶¶ 166, 167, 168, 170. Notwithstanding such information, the court cannot determine whether these employees were similarly situated to Cannon-Stokes because she has not offered evidence regarding their job responsibilities, medical restrictions, supervisors, qualifications, or whether they engaged in similar conduct.

24

The only possible incident of retaliation that the evidence may support involves Cannon-Stokes' rescinded transfer between the Graceland Annex and the Austin station in April of 1996. The evidentiary record supports a finding that Cannon-Stokes contacted the EEO office or made some form of an EEO complaint prior to April of 1996. *See* PSOF ¶ 157. As a result of the rescinded transfer, Cannon-Stokes was unassigned to any postal station for eight weeks and, consequently, not working. This, in turn, caused her to lose annual leave, sick leave, and an increase in pay. *See* PSOF ¶ 110. Such temporary losses may constitute an adverse employment action. *See Hilt-Dyson* v. *City of Chicago*, 282 F.3d 456 at 465-66 (7th Cir. 2002) (discussing that materially adverse employment actions may include "a material loss of benefits" while noting that an adverse employment action "need not be quantifiable in terms of pay or benefits."); *cf. Stutler* v. *Ill. Dep't of Corr.*, 263 F.3d 698 (7th Cir. 2001) (plaintiff failed to state a *prima facie* claim of retaliation where temporary suspensions and a lateral transfer did not result in a decrease in benefits). Unfortunately, Cannon-Stokes made no argument or attempt to develop the record in this regard and, instead, focused her claim of retaliation on the words of her supervisors, *e.g.*, being told by Holman to return to the Austin station and being told by Sims to "get out," rather than on the effects of her supervisors' actions. Cannon-Stokes also has not identified any similarly situated individuals who successfully transferred from postal station to postal station despite neither station having an available position to meet their restrictions, and, thus, fails to state a claim of retaliation.

Because Cannon-Stokes has failed to establish a *prima facie* claim of retaliation, the court grants Potter's motion for summary judgment on that claim.[18]

---

[18]Since the court has decided Potter's motion for summary judgment on its merits and in his favor, the court finds it unnecessary to address Potter's argument regarding judicial estoppel.

## ORDER

For the reasons stated above, Potter's motion for summary judgment [#40] is granted. This case is terminated.

ENTER:

JOAN HUMPHREY LEFKOW
United States District Judge

Dated: November 3, 2005